SHARON REALTY COMPANY, PLAINTIFF, *v.* WESTLAKE ET, DEFENDANTS.

Common Pleas Court, Franklin County.

No. 210053.    Decided June 20, 1961.

*Mr. Kenneth B. Johnston*, for plaintiff.

*Mr. Russell Leach*, city attorney, *Mr. John C. Young*, first asst. city attorney, and *Mr. Frank A. Reda*, chief counsel, for defendants,

SATER, J. This is a taxpayer's suit brought against sixteen named officials and representatives of the City of Columbus to enjoin the City from misapplying municipal funds and abusing corporate municipal powers. The case is submitted on the petition and answer, a stipulation of agreed facts, various exhibits numbered A through V, and voluminous thoughtfully prepared briefs.

It is stipulated that plaintiff is a taxpayer. It is beyond question that it brings this action rightfully, properly and lawfully under section 74 of the City's charter buttressed, if necessary, by Sections 733.56 to 733.61, both inclusive, Revised Code. The defendants are the City's Mayor Westlake, the seven members of its Council, the seven members of the Slum Clearance and Rehabilitation Commission, and the Commissions' director.

Close to ten years ago, the City, through its proper officials undertook studies covering five widely diversified phases of civic improvement, both municipal and metropolitan. From their studies came a "Master Plan." Unfortunately this Plan is not in evidence before us; but from reference to it in Ordinance 1518-54 which is Exhibit B herein, it may reasonably be concluded that that Plan embraced substantially more than City Slum areas.

On November 22, 1954, City Council enacted Ordinance 1518-54. This Ordinance adopted five reports, under separate headings, of its said officials as "Base Plans for the Master Plan." Again, none of these reports is in evidence but by giving the reports, Plans and Ordinance the benefit of every doubt, two of the reports, numbers 1 and 4, seem to encompass the area which has come to be familiarly known as the Market-Mohawk Area. This area now is bounded roughly on the north by Chapel Street, on the west by South Third Street, on the south by East Fulton Street, and on the east by South Grant Avenue; but from the northeast corner of the rectangle there

was excluded the properties, site and area of Grant Hospital and from the central-western side of the area (see Exhibits F, G, H, I, J, K and T) there was also excluded later, if not from the start, a large tract of land running eastwardly from South Third Street between East Rich and East Noble Street, a distance of two city blocks. We wonder in vain whether this tract was ever a part of the original studies or of the Master Plan; and if it was, when and why it was dropped. No other area, certainly, that might fall within these Base Plans is directly involved in or affected by this litigation.

Eighteen months later on May 21, 1956, and presumably with only these nebulous reports and Base Plans before it, Council adopted a Resolution, Exhibit Q herein, calling for a vote at a special election on the issuance of $5,000,000.00 in bonds with a complementary tax levy to be the City's matching share of a federal project to clear four slum areas, one of which was the Market-Mohawk area. Exhibit R is the ballot that was presented to the voters in September, 1956. Both Resolution and ballot referred to Ordinance 1518-54 but neither described either reports or Base Plans or set out even by metes and bounds the Market-Mohawk area or any other involved area; to the contrary they named four areas completely different in at least nomenclature from what is found in Ordinance 1518-54, above, making it almost impossible for us to determine whether the ballot conforms to the original reports, to the Master Plan, to the Base Plans for the Master Plan, or to any or all of them. Because time was of the essence to secure federal participation, i. e., three-fold greater financial largess, the Resolution was passed as an emergency measure; the election was held; and the bond issue was approved. It should be carefully noted, however, that neither Ordinance 1518-54 nor Resolution nor ballot reserved to City Council the power to revise or amend any of these plans for area rehabilitation; that came later after the comfort of liberal bond money had been assured by the voting public. Certainly the ballot must be construed in the light of the Resolution and Ordinance that preceded it, not by what might follow.

Nineteen months later on June 2, 1958, City Ordinance 818-58 was enacted. Among other things this Ordinance pinned

down precisely the Market-Mohawk area, gave it a federal title "UR Ohio 4-2," as well as a local title, sometimes "Market-Mohawk Urban Renewal Project" and sometimes "Redevelopment Plan for the Project Area, dated May 8, 1958 (which incidentally is not in evidence before us either) entitled 'Market-Mohawk Redevelopment Plan—Code 307,' " referred, in passing to Ordinance No. 1518-54 but not to its Plan or the maps in evidence that were prepared sometime between the two ordinances, and set out a redevelopment plan for the entire area consisting inter alia of residential zones with "Tot Lots," commercial-retail and commercial-office zones with buildings of limited height, all zones being accompanied with building set-back requirements and with off-street parking and loading areas. On page 493, col. 1, No. 4, of this Ordinance, it was found and determined "that the above-mentioned Redevelopment Plan will afford maximum opportunity, consistent with the sound needs of the city as a whole, *for the redevelopment of the area by private enterprise*"; this bent to redevelopment by private enterprise is found repeatedly and unequivocally throughout the Ordinance and in the Slum Clearance Code (Exhibit P).

The map No. 2 referred to in this Ordinance is, as far as we can ascertain, Exhibit T. Then at the end of the Ordinance comes the novel reservation that this Plan "may be modified at any time by the City Council of the city of Columbus." Judiciously used, this reservation of power could inure to the benefit of all; used otherwise it could be the lever for amending or revising the Redevelopment Plan completely out of existence, either in one fell swoop or by slow erosion of the Plan by blocks, quarter-blocks or segments thereof. Certainly if this reservation of power is to stand, it must be used in strict compliance with section 21 of the City Charter which reads:

"No ordinance or resolution or section thereof shall be revised or amended, unless the new ordinance or resolution contains the entire ordinance or resolution or section revised or amended, and a repeal of the original ordinance, resolution, section or sections so amended."

On December 22, 1960, there was enacted Ordinance 1427-60, which is Exhibit D herein. It mentions the two preceding ordinances by number but without making any effort to comply

with the charter section just quoted. This ordinance amended Section 7 of Ordinance 818-58, above, insofar as Section 7 relates to area zones previously planned for commercial uses. These amendments include increasing the maximum building height from 125 feet to 200 feet, eliminate set-back requirements in some areas, change some off-street parking and loading facility requirements, and affirm the right of the (presumably still, private) developer to relocate *at his own expense* an underground utility with the consent and approval of the controlling City officials and the public utility itself. Other seemingly small or insignificant amendments were made, but the key to all of these changes and amendments is found in the second paragraph of this Ordinance: "Whereas, the State of Ohio desires to purchase this land to erect a new state office building" etc. This Ordinance was vetoed by the defendant Mayor.

In and of themselves these revisions and amendments may seem to be relatively immaterial but when they are taken in inescapable conjunction with the desire of the State of Ohio to buy this land to erect a new state office building and with City Council's reservation of power to revise, they take on a completely different and potent significance. "But when the fox had once got in his nose, he'll soon find means to make the body follow." Since it is impossible to conceive of housing all state agencies now spread around this City into contiguous commercial-office segments (see Exhibit T) composing 1¼ city blocks at most in the Market-Mohawk Area and leave any space for future growth, the questions naturally arise, How much more of this Area will be needed? Where will the needed space be taken? Will it be 1¼ city blocks, or four, or more? What will become of Exhibit T's well thought-out plan? How often and how much more will City Council find it necessary or expedient to further amend or revise parts of the Exhibit T plan out of existence? (Were it not so tragic it would be amusing to visualize [see Exhibits L and T] the fourth greatest state in the union constructing a state office building with a church on the northwest corner and a grocery store on the southwest.)

Finally, eighteen days after the Mayor's veto, Ordinance 1467-60 was repassed over his veto on January 9, 1961. This is Exhibit E, but this time instead of being an out-and-out amend-

ment of Ordinance 818-58 (Exhibit C), as was the predecessor version of Ordinance 1467-60 (Exhibit D), it is the spreading upon the records of a contract by the City to sell what appears on Exhibit L as blocks A, D and E being the land bounded on the north by East Chapel Street, on the west by South Third Street, on the south by East Rich Street, and on the east by South Fourth Street, excepting therefrom the church property on the northwest corner and the large grocery store on the southwest corner.

We may not override an ordinance simply because it is injudicious or improvident, but we cannot fail to hold that the opening words of this Ordinance, Exhibit E, carry the seeds of its own death. They read:

"To authorize Councilman Robert L. VanHeyde to enter into a contract with the State of Ohio for the sale of certain properties (see Exhibit L, above) located in the Market-Mohawk Urban Renewal Area as hereinafter set forth for the purpose of building a state office building.

"Whereas, the Council of the City of Columbus has declared its intent to sell property in the Market-Mohawk Urban Renewal Area for a State Office Building, and

"Whereas, The terms of said contract have been agreed upon:

"NOW, THEREFORE:

"Be it ordained by the Council of the City of Columbus:

"Section 1. That Councilman Robert L. VanHeyde is hereby authorized and directed to execute the contract of sale which follows herein in behalf of the City of Columbus."

Later the contract states,

"Whereas, the State was designated the redeveloper" of the tract covered by the proposed contract.

This ordinance-contract or contract-ordinance, whichever one may wish to call it, sets out in some detail the respective rights and duties of the City of Columbus and of the State of Ohio but because of the two foregoing quotations they need not here be set forth or considered. The Ordinance is void.

In the first place, if such a contract is to be signed, it must be signed by the mayor or by the city administrative official whose office and duties cover the signing of such a document.

It may not be signed by any member of the City Council. Section 3 of the Columbus City Charter (Exhibit A) vests all legislative power in the City Council, and there its jurisdiction ends. Entirely different sections of the Charter allocate executive and administrative functions elsewhere. Nor do past variations and looseness from this mandate and procedure, be they occasional or frequent, lend an aura of respectability or legality to any other mode of practice; neither Council nor Mayor may disregard provisions of the City Charter at any time. See *John Mueller Co.* v. *Bonding Co.*, 32 Ohio Nisi Prius, N. S., 305, 310-311 and *Messinger* v. *Cincinnati*, 36 Ohio App., 337, 341. Section 57 of the City Charter vests the executive and administrative powers of the City in the mayor, directors of departments and other administrative officers and boards provided for in the charter or by ordinance. Section 60 empowers the mayor to appoint, among others, the directors of public safety and of public service. Other sections of the Charter, 97, 115 and 116, detail the administrative field belonging to the director of public service. In these sections and in these officials lie the duty and power to sign contracts. See *State, ex rel. Leach,* v. *Redick,* 168 Ohio St., 543.

Nor is the *Redick case* alone as Ohio authority. In *Nat'l. Engineering and Contracting Co.* v. *Cleveland,* 76 Ohio Law Abs., 303, the ordinance directed the director of public service to sign the contract. So also in *Brezek* v. *Stewart,* 32 Ohio Law Abs., 277, 280 (aff'd., 137 Ohio St., 539). And again there are the very pertinent statements of the court in *Snyder* v. *Village of McArthur,* 99 Ohio App., 324, 326-327. In *Green, etc.,* v. *Thomas,* 37 Ohio App., 489, 494 (app. dis., 123 Ohio St., 669), Columbus' mayor and director of public service signed the deed. On the other hand, for what happens (voidness), when the wrong city official signs the document, see *City of Tiffin* v. *Shawhan,* 43 Ohio St., 178, 186-187. True, no two city charters likely carry the precisely same wording but it is an absurdity to argue that they all, like the statutes of Ohio, do not adhere strictly to America's standard division of powers: legislative, executive and judicial.

In the second place, the State of Ohio is not a private developer or a public corporation within the import of Ordinance

818-58, supra; nor can it be made so by councilar fiat. It is not a question whether the contract sale price is higher than private developers would offer; it is a question whether the State may buy at all as the ordinances now stand.

The State is obviously not a private developer. Nor is it a public corporation. A public corporation is an instrumentality of the state, formed and owned by the state in the public interest, supported by public funds and governed by managers deriving their authority from the state. *Levin* v. *Hospital*, 46 Atl. (2d), 298, 186. Maryland, 174; *Hughes* v. *Hospital*, 158 S. W. (2d), 159, 161; *Goldman* v. *Home Owners Loan Corp.*, 15 N. Y. Supp. (2d), 968. And also *Chambers County* v. *Lee County*, 55 Alabama, 534, 537; *Kerr* v. *Library*, 54 Fed. Supp., 514, 523; *United Accounts, Inc.* v. *Dachtler*, 100 N. W., 93, 95; and *Kiner* v. *Well*, 71 N. W. (2d), 743, 749. Public corporations include such entities as Bridge Authorities, Agriculture Societies, Turnpike Commissions, cities and counties, Housing Authorities, Irrigation Districts, Water Districts and Toll Bridge Authorties; but not sovereign states.

As far back as 1956, Council enacted into the City Code, Title 35, "Slum Clearance and Urban Renewal Code." It is in pari-materia with the various ordinances discussed above, and its sweep is definitely broad enough to cover all parts of the Market-Mohawk Area. Its section 3511.04(d), Revised Code, says:

"That the renewal plan with the project area will afford maximum opportunity consistent with the sound needs of the locality as a whole for the renewal of the project area *by private enterprise*" . . . . . .

This title and section were not in existence at the time of the *Thomas case, supra*, and consequently did not hamper that transaction. This title and section taken alone might be considered to be definitive only; but taken in conjunction with the various ordinances discussed above as they now stand, it all takes on a deeper significance and becomes mandatory. Here applies the doctrine expressio unius est exclusio alterius. Nor has the State attempted so far to exercise its power of eminent domain.

Because of insufficiency of the record before us relating to

the early studies, reports and Master Plan, and because of prematurity of some later matters, we refrain (*Cincinnati* v. *Vester*, 281 U. S., 439, 449; 74 L. ed., 950, 956), from passing upon the other questions that have been argued before us. For example, since it has admittedly not yet been done, we can only hope that had Ordinance 1467-60 as repassed been able to stand, its municipal expenditure features would some time have been referred to the City Auditor as Section 159 of the City Charter requires. The City would unquestionably have assumed financial obligations even though it be only replacement of sewers, water mains, walks and curbing; and it is no answer to say that municipal employees will do the work when they might have been engaged in other badly needed municipal work and payment must be made them whether it comes from bond revenues or general funds. There is also the matter of the Central Market House but it has not yet been the subject of action to appropriate. The matter of the relocation of underground utility lines with estimated cost ranging from $75,000.00 to $400,-000.00 ($75,000.00 would probably just about pay for trenching and nothing else), is not yet ripe. These matters defendants say will not "cost the City a dime" but facilities for utility services do not freely and voluntarily replace themselves; if the City pays these costs, it would likely be selling tracts A, D and E for the proverbial "song"; if it should not pay, the burden would fall on the taxpayers and utility customers despite and in addition to any bond issue. And so on through both briefs.

The injunction is granted to the extent noted above, i. e., against the execution of Ordinance 1467-60 as repassed January 9, 1961. Costs and five hundred dollars for plaintiff's attorney fees are awarded plaintiff.

SHARON REALTY COMPANY, PLAINTIFF, *v.* WESTLAKE ET, DEFENDANTS.

## REVISED DECISION

SATER, J. In response to request of certain defendants, the Court clarifies its decision of June 20, 1961, as follows:

This is a taxpayer's suit brought against sixteen named officials and representatives of the City of Columbus to enjoin the City from misapplying municipal funds and abusing corporate municipal powers. The case is submitted on the petition and answer, a stipulation of agreed facts, various exhibits numbered A through V, and voluminous briefs.

It is stipulated that plaintiff is a taxpayer. It is beyond question that it brings this action rightfully, properly and lawfully under section 74 of the City's charter buttressed, if necessary, by Sections 733.56 to 733.61, both inclusive, Revised Code. The defendants are the City's Mayor Westlake, the seven members of its Council, the seven members of the Slum Clearance and Rehabilitation Commission, and the Commissions' director.

Close to ten years ago, the City, through its proper officials undertook studies covering five widely diversified phases of civic improvement, both municipal and metropolitan. From their studies came a "Master Plan." Unfortunately this plan is not in evidence before us; but from reference to it in Ordinance 1518-54 which is Exhibit B herein, it may reasonably be concluded that that Plan embraced substantially more than City Slum areas.

On November 22, 1954, City Council enacted Ordinance 1518-54. This Ordinance adopted five reports, under separate headings, of its said officials as "Base Plans for the Master Plan." Again, *none of these reports is in evidence* but by giving the reports, Plans and Ordinance the benefit of every doubt, two of the reports, numbers 1 and 4, seem to encompass the area which has come to be familiarly known as the Market-Mohawk Area. This area now is bounded roughly on the north by Chapel Street, on the west by South Third Street, on the south by East Fulton Street, and on the east by South Grant Avenue; but from the northeast corner of the rectangle there was excluded the properties, site and area of Grant Hospital, and from the central-western side of the area (see Exhibits F, G, H, I, J, K and T) there was also excluded later, if not from the start, a large tract of land running eastwardly from South Third Street between East Rich and East Noble Street, a distance of two city blocks. We wonder in vain whether this tract was ever a part of the original studies or of the Master Plan; and

if it was, when and why it was dropped. No other area, certainly, that might fall within these Base Plans is directly involved in or affected by this litigation.

Eighteen months later on May 21, 1956, and presumably with only these nebulous reports and Base Plans before it, Council adopted a Resolution, Exhibit Q herein, calling for a vote at a special election on the issuance of $5,000,000.00 in bonds with a complementary tax levy to be the City's matching share of a federal project to clear four slum areas, one of which was the Market-Mohawk area. Exhibit R is the ballot that was presented to the voters in September, 1956. Both Resolution and ballot referred to Ordinance 1518-54 but neither described either reports or Base Plans or set out even by metes and bounds the Market-Mohawk area or any other involved area; to the contrary they named four areas completely different in at least nomenclature from what is found in Ordinance 1518-54, above, making it almost impossible for us to determine whether the ballot conforms to the original reports, to the Master Plan, to the Base Plans for the Master Plan, or to any or all of them. Because time was of the essence to secure federal participation, i. e., three-fold greater financial largess, the Resolution was passed as an emergency measure; the election was held; and the bond issue was approved. It should be carefully noted, however, that neither Ordinance 1518-54 nor Resolution nor ballot reserved to City Council the power to revise or amend any of these plans for area rehabilitation; that came later after the comfort of liberal bond money had been assured by the voting public. Certainly the ballot must be construed in the light of the Resolution and Ordinance that preceded it, not by what might follow.

Nineteen months later on June 2, 1958, City Ordinance 818-58 was enacted. Among other things this Ordinance pinned down precisely the Market-Mohawk area, gave it a federal title "UR Ohio 4-2," as well as a local title, sometimes "Market-Mohawk Urban Renewal Project" and sometimes "Redevelopment Plan for the Project Area, dated May 8, 1958 (*which incidentally is not in evidence before us either*) entitled 'Market-Mohawk Redevelopment Plan—Code 307,' " referred, in passing to Ordinance No. 1518-54 but not to its Plan or the

maps in evidence that were prepared sometime between the two ordinances, and set out a redevelopment plan for the entire area consisting inter alia of residential zones with ''Tot Lots,'' commercial-retail and commercial-office zones with buildings of limited height, all zones being accompanied with building set-back requirements and with off-street parking and loading areas. On page 493, col. 1, No. 4, of this Ordinance, it was found and determined ''that the above-mentioned Redevelopment Plan will afford maximum opportunity, consistent with the sound needs of the city as a whole, *for the redevelopment of the area by private enterprise*''; this bent to redevelopment by private enterprise is found repeatedly and unequivocally throughout the Ordinance and in the Slum Clearance Code (Exhibit P).

The map No. 2 referred to in this Ordinance is, as far as we can ascertain, Exhibit T. Then at the end of the Ordinance comes the novel reservation that this Plan ''may be modified at any time by the City Council of the city of Columbus.'' Judiciously used, this reservation of power could inure to the benefit of all; used otherwise it could be the lever for amending or revising the Redevelopment Plan completely out of existence, either in one fell swoop or by slow erosion of the Plan by blocks, quarter-blocks or segments thereof. Certainly if this reservation of power is to stand, it must be used in strict compliance with section 21 of the City Charter which reads:

''No ordinance or resolution or section thereof shall be revised or amended, unless the new ordinance or resolution contains the entire ordinance or resolution or section revised or amended, and a repeal of the original ordinance, resolution, section or sections so amended.''

On December 22, 1960, there was enacted Ordinance 1427-60, which is Exhibit D herein. It mentions the two preceding ordinances by number but without making any effort to comply with the charter section just quoted. This ordinance amended Section 7 of Ordinance 818-58, above, insofar as Section 7 relates to area zones previously planned for commercial uses. These amendments include increasing the maximum building height from 125 feet to 200 feet, eliminate set-back requirements in some areas, change some off-street parking and loading facility requirements, and affirm the right of the (presumably still, pri-

vate) developer to relocate *at his own expense* an underground utility with the consent and approval of the controlling City officials and the public utility itself. Other seemingly small or insignificant amendments were made, but the key to all of these changes and amendments is found in the second paragraph of this Ordinance: "Whereas, the State of Ohio desires to purchase this land to erect a new state office building" etc. This Ordinance was vetoed by the defendant Mayor.

In and of themselves these revisions and amendments may seem to be relatively immaterial but when they are taken in inescapable conjunction with the desire of the State of Ohio to buy this land to erect a new state office building and with City Council's reservation of power to revise, they take on a completely different and potent significance, "But when the fox had once got in his nose, he'll soon find means to make the body follow." Since it is impossible to conceive of housing all state agencies now spread around this City into contiguous commercial-office segments (see Exhibit T) composing 1¼ city blocks at most in the Market-Mohawk Area and leave any space for future growth, the questions naturally arise, How much more of this Area will be needed? Where will the needed space be taken? Will it be 1¼ city blocks, or four, or more? What will become of Exhibit T's well thought-out plan? How often and how much more will City Council find it necessary or expedient to further amend or revise parts of the Exhibit T plan out of existence? (Were it not so tragic it would be amusing to visualize [see Exhibits L and T] the fourth greatest state in the Union constructing a state office building with a church on the northwest corner and a grocery store on the southwest.)

Finally, eighteen days after the Mayor's veto, Ordinance 1467-60 was repassed over his veto on January 9, 1961. This is Exhibit E, but this time, instead of being an out-and-out amendment of Ordinance 818-58 (Exhibit C), as was its companion legislation, Ordinance 1427-60 (Exhibit D), it is spreading upon the records of a contract by the City to sell what appears on Exhibit L as blocks A, D and E being the land bounded on the north by East Chapel Street, on the west by South Third Street, on the south by East Rich Street, and on the east by South Fourth Street, excepting therefrom the church property on the

northwest corner and the large grocery store on the southwest corner.

We may not override an ordinance simply because it is injudicious or improvident, but we cannot fail to hold that the opening words of this Ordinance, Exhibit E, carry the seeds of its own death. They read:

"To authorize Councilman Robert L. VanHeyde to enter into a contract with the State of Ohio for the sale of certain properties (see Exhibit L, above) located in the Market-Mohawk Urban Renewal Area as hereinafter set forth for the purpose of building a state office building.

"Whereas, the Council of the City of Columbus has declared its intent to sell property in the Market-Mohawk Urban Renewal Area for a State Office Building, and

"Whereas, The terms of said contract have been agreed upon:

"NOW, THEREFORE:

"Be it ordained by the Council of the City of Columbus:

"Section 1. That Councilman Robert L. VanHeyde is hereby authorized and directed to execute the contract of sale which follows herein in behalf of the City of Columbus."

Later the contract states,

"Whereas, the State was designated the redeveloper" of the tract covered by the proposed contract.

This ordinance-contract or contract-ordinance, whichever one may wish to call it, sets out in some detail the respective rights and duties of the City of Columbus and of the State of Ohio but because of the two foregoing quotations they need not here be set forth or considered. The Ordinance is void.

In the first place, if such a contract is to be signed, it must be signed by the mayor or by the city administrative official whose office and duties cover the signing of such a document. It may not be signed by any member of the City Council. Section 3 of the Columbus City Charter (Exhibit A) vests all legislative power in the City Council, and there its jurisdiction ends. Entirely different sections of the Charter allocate executive and administrative functions elsewhere. Nor do past variations and looseness from this mandate and procedure, be they occasional or frequent, lend an aura of respectability or legality to any other mode of practice; neither Council nor Mayor may disre-

gard provisions of the City Charter at any time. See *John Mueller Co.* v. *Bonding Co.*, 32 Ohio Nisi Prius, N. S., 305, 310-311 and *Messinger* v. *Cincinnati*, 36 Ohio Appeals, 337, 341. Section 57 of the City Charter vests the executive and administive powers of the City in the mayor, directors of departments and other administrative officers and boards provided for in the charter or by ordinance. Section 60 empowers the mayor to appoint, among others, the directors of public safety and of public service. Other sections of the Charter, 97, 115 and 116, detail the administrative field belonging to the director of public service. In these sections and in these officials lie the duty and power to sign contracts. See *State, ex rel. Leach,* v. *Redick,* 168 Ohio St., 543.

Nor is the *Redick case* alone as Ohio authority. In *Nat'l. Engineering and Contracting Co.* v. *Cleveland,* 76 Ohio Law Abs., 303, the ordinance directed the director of public service to sign the contract. So also in *Brezek* v. *Stewart,* 32 Ohio Law Abs., 277, 280 (aff'd., 137 Ohio St., 539). And again there are the very pertinent statements of the court in *Snyder* v. *Village of McArthur,* 99 Ohio App., 324, 326-327. In *Green, etc.,* v. *Thomas,* 37 Ohio App., 489, 494 (app. dis., 123 Ohio St., 669), Columbus' mayor and director of public service signed the deed. On the other hand, for what happens (voidness), when the wrong city official signs the document, see *City of Tiffin* v. *Shawhan,* 43 Ohio St., 178, 186-187. True, no two city charters likely carry the precisely same wording but it is an absurdity to argue that they all, like the statutes of Ohio, do not adhere strictly to America's standard division of powers: legislative, executive and judicial.

In the second place, the State of Ohio is obviously not a private developer within the meaning of Ordinance 818-58, supra, or of the Slum Clearance and Urban Renewal, title 35 of the Columbus City Code, section 3511.04(d) of which states,

"That the renewal plan with the project area will afford maximum opportunity consistent with the sound needs of the locality as a whole for the renewal of the project area *by private enterprise*" . . . . .

or of both of them joined together. The State per se cannot be made to fit this Procrustean bed by councilmanio fiat. It is a sovereign state, and as such it is nothing less.

Nor is the State of Ohio a public corporation within the meaning of Section 3501.04 of the City Code's title 35, supra, which states that

" 'Redeveloper' shall mean any person, firm or public or private corporation purchasing or leasing property within a project area from the City for use in accordance with the renewal plan."

Public corporations are instrumentalities created by the state, formed and owned by it in the public interest, supported in whole or part by public funds, and governed by managers deriving their authority from the state. They include, for example, such entities as Bridge Authorities, Agricultural Societies, Turnpike Commissions, cities, counties, townships, Housing Authorities, Conservancy Districts, and state and local institutions of learning and of healing. *Levin* v. *Hospital*, 46 Atl. (2d), 298; *Hughes* v. *Hospital*, 158 S. W. (2d), 159; *Goldman* v. *Home Owners Loan Corp'n.*, 15 N. Y. Supp. (2d), 968; *Chambers County* v. *Lee County*, 55 Ala., 534; *Kerr* v. *Library*, 54 Fed. Supp., 514; *United Accounts, Inc.* v. *Dachtler*, 100 N. W., 93, and *Kiner* v. *Well*, 71 N. W. (2d), 743. But public corporations are not sovereign states; they are lesser entities. There is nothing in the legislative history of the Market-Mohawk area to halt participation by a public corporation; but it is equally clear from that history that there never was any intention to authorize redevelopment of all or any part of that area by the State of Ohio in its sovereign capacity. So much history cannot be repealed in the manner attempted by Ordinance 1467-60 (Exhibit E).

To recapitulate, certain conclusions and results follow: (1) None of these titles, sections and ordinances were in existence at the Time of the *Thomas case, supra,* and consequently did not hamper that transaction, (2) Any one of these titles, sections and ordinances might be argued to be definitive only; but taken, as they must be, in pari materia, they take on a deeper significance and become mandatory. Together they exemplify the doctrine "Expressio unius est exclusio alterius." (3) The Court had here under consideration only an attempted sale wherein the sovereign State of Ohio, as compared with and as over and against any other types of entity, public or private, was the contracting buyer, and any effort to read anything more

into this case is without warrant; thus, while sales in this case to a person, firm or public or private entity may be authorized, sale to the sovereign State of Ohio is precluded. (4) Nor is there here any attempt to limit the use of the power of eminent domain.

Because of insufficiency of the record before us relating to the early studies, reports and Master Plan, and because of prematurity of some later matters, we refrain (*Cincinnati* v. *Vester*, 281 U. S., 439, 449; 74 L. ed., 950-956), from passing upon the other questions that have been argued before us. For example, since it has admittedly not yet been done, we can only hope that had Ordinance 1467-60 as repassed been able to stand, its municipal expenditure features would some time have been referred to the City Auditor as Section 159 of the City Charter requires. The City would unquestionably have assumed financial obligations even though it be only replacement of sewers, water mains, walks and curbing; and it is no answer to say that municipal employees will do the work when they might have been engaged in other badly needed municipal work and payment must be made them whether it comes from bond revenues or general funds. There is also the matter of the Central Market House but it has not yet been the subject of action to appropriate. The matter of the relocation of underground utility lines with estimated cost ranging from $75,000.00 to $400,000.00 ($75,000.00 would probably just about pay for trenching and nothing else), is not yet ripe. These matters defendants say will not "cost the City a dime" but facilities for utility services do not freely and voluntarily replace themselves; if the City pays these costs, it would likely be selling tracts A, D and E for the proverbial "song"; if it should not pay, the burden would fall on the taxpayers and utility customers despite and in addition to any bond issue. And so on through both pleadings and briefs.

This revised decision replaces that of June 20, 1961, herein. The injunction against the execution of Ordinance 1467-60 (Exhibit E) is made permanent. Costs are awarded to plaintiff. The matter of fee to counsel for plaintiff will be held for determination on final disposition of this case.